UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| SOUTH TEXAS ELECTRIC COOPERATIVE, | § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. V-06-28 |
| DRESSER-RAND COMPANY | § § | |
| Defendant. | § | |

<u>MEMORANDUM OPINION & ORDER</u>

Pending before the court is Defendant's Motion for Summary Judgment (dkt. #20). After considering the motion, response, and applicable law, the court is of the opinion that the motion should be GRANTED in part.

**Facts**

On October 10, 2001, Plaintiff, South Texas Electric Cooperative ("STEC") and Defendant, Dresser-Rand Company ("Dresser") executed a contract for the design and construction of a steam turbine unit at STEC's Sam Rayburn Power Plant.  The contract required Dresser to provide equipment, materials, and field services free from defects in material and workmanship.[1]  It also required that the equipment would meet certain performance guarantees.[2]  In August 2003, the steam turbine unit ("ST") began operation and immediately experienced excessive vibrations well above recommended levels.  Although the problems with the ST were never resolved by Dresser, STEC made final payment on February 4, 2004.

---

[1] The full contract can be found in P.'s Resp. (dkt. #22), Ex. A.  *See* ¶ 13.01(A).

[2] ¶ 13.07(A).

Dresser seeks summary judgment on several grounds.  First, it contends STEC waived its breach of contract and breach of warranty claims because it accepted the equipment and materials by making final payment, and/or STEC waived its claims because it did not demand repair or reimbursement for remedying the defects during the warranty period or thereafter.  Dresser also maintains that STEC cannot recover the costs of repairing any defects because it never provided ten days written notice to Dresser before remedying the defects itself as required by the contract. Dresser additionally argues that STEC's lawsuit is premature because it did not satisfy the condition precedent requiring the parties to participate in dispute resolution.

In order to fully analyze the issues involved in Dresser's motion for summary judgment, the court must recount the numerous communications between the parties relating to the excessive vibration in the ST unit.  The relevant personnel include Lynn Blakeman, Dresser's former project manager for the STEC project; Brian Basel ("Basel"), STEC's project manager; Richard Pielow ("Pielow"), Dresser's project manager for the STEC project; John Packard ("Packard"), STEC's plant manager; and Mike Friedel ("Friedel"), the Burns & McDonnell contract engineer hired by STEC to coordinate the project.

The relevant communications began in August 2003, around the time the ST began operation.  During this start-up period, Dresser was in the process of reducing its staff, making it extremely difficult for STEC to reach any Dresser personnel to address the vibration problem.[3]

---

[3]  In an internal Dresser email dated August 4, 2003, Lynn Blakeman wrote to a Dresser employee in the Olean, New York corporate office that the on-site Houston Controls Engineer for the STEC project had been terminated.  He recognized that STEC was "pretty frustrated" with the lack of Dresser support during the start-up phase.  P.'s Resp. (dkt. #22), Ex. C.  Lynn Blakeman was also terminated in August 2003.  An internal STEC email dated September 3, 2003 between  Basel and the contract engineer indicated that he was finally able to reach someone at Dresser who could assist them with the ST performance problems after Lynn

When Dresser was notified of the problem, it sent emails to STEC on August 12 (before testing the equipment) and again on August 20 indicating that the vibration could be caused by pipe stress, in which case Dresser "will not be held liable for the solution and in fact, may seek financial restitution for the completed analysis."[4]  In response, STEC verified that the piping measurements were correct, and on August 22 requested that Dresser continue to investigate the problem and provide it with a vibration report based on Dresser's testing of the unit.[5]  When Dresser did not promptly fix the problem or provide the vibration report, STEC retained Bently-Nevada to conduct a vibration analysis.  According to an STEC internal email, Basel discussed STEC's hiring of Bently-Nevada with Richard Pielow, the new project manager from Dresser, and Dresser agreed to pay the backcharges for Bently-Nevada's services.[6]  Basel sent Pielow the Bently-Nevada vibration analysis and requested comments on the report, as well as Dresser's action plan for resolving the problem.[7]  Basel ended the email by emphasizing that "problems that restrict full load operation of the steam turbine need to be resolved prior to the test date" on September 26.[8]

---

Blakeman's termination. *Id.* Ex. F.

[4] *Id.* Ex. G.

[5] *Id.* Ex. H.

[6] "[Basel] informed [Pielow] that STEC had made arrangements to have Bently Nevada to the site starting tomorrow to check the vibration measurement equipment and the vibration of the steam turbine. [Basel] told [Pielow] that if it is found that there is an equipment problem, Dresser would be backcharged for the cost of having Bently come to the site. [Pielow] agreed that they would accept this if it is a problem with their equipment." *Id.* Ex. I.  Dresser objects to the court's consideration of this email as hearsay.  Because there is sufficient evidence otherwise to support the court's ruling, the court will not address the hearsay objection at this time.

[7] *Id.* Ex. J.

[8] *Id.*

3

Basel contacted Pielow again on October 14, stating that he was still waiting on Dresser's plan to resolve the problem and  requested that Dresser "please provide this information today. Resolution of the ST vibration problem is essential to successful completion of this project and is impacting STEC's ability to reach full capacity on the new plant."[9]  The next day, Friedel, the contract engineer, emailed Pielow attaching performance data collected by STEC and indicating that the ST was approximately 0.79% below guaranteed capacity.[10]  He requested, pursuant to the contract documents, that Dresser prepare a test report and submit it to him by October 28.[11]

Dresser eventually provided an action plan to resolve the vibration problem on October 17, approximately two months after STEC reported the problem.  Dresser outlined four steps they could take to remedy the problem.  It offered to supply and install larger bearing orifices and anticipated the new orifices being ready around the second or third week in November.  Dresser also indicated it would send out personnel to take pyrometer readings and check the alignment on the unit.[12]

The parties proceeded to complete the contract closeout requirements.  On October 21, 2003, Friedel sent Pielow a letter citing the remaining issues under the contract.  Friedel specifically cited Paragraph 13.04 of the contract, which states: "Contractor's responsibility for remedying all defects in the Equipment and Material shall extend for a period of twelve (12) months from the date of acceptance or twenty-one (21) months from the date of delivery to the Site, whichever shall occur first."  Friedel stated: "Due to ongoing vibration problems, which prevent full-load operation, STEC

---

[9]  D.'s M.S.J. (dkt. #20), Ex. 3, tab B.

[10]  P.'s Resp. (dkt. #22), Ex. P.

[11]  *Id.*

[12]  *Id.* Ex. K.

4

has not accepted the Equipment and Material.  Thus, the correction period defaults to the date of delivery.  According to our records, the last major turbine piece was received on December 21, 2002.  Thus, the correction period for the Equipment and Material provided by this contract shall run through September 21, 2004."[13]

The November 7 memorandum exchanged between the parties contained minutes of the closeout meeting held on October 31, 2003.  The memorandum identified Dresser Action Items as: (1) Send STEC and B&McD a report on the vibration measurements that were taken by Dresser during the plant performance test; (2) Check on maximum recommended vibration alarm and trip levels and provide to STEC and B&McD; (3) Provide correction curve for back pressure and perfomance test report as requested in Mike Friedel's October 15, 2003 email to Dick Pielow; . . . (5) Pursue resolution of the high vibrations for the steam turbine.[14]  The Meeting Notes also provided that the main punchlist items that remained were "the high STG vibration. . .."[15]  The notes also  acknowledged that Dresser was still in the process of implementing its plan relating to the ST vibration outlined in Pielow's email on October 17, 2003.  Specifically, Dresser was still planning to install the bearing orifices and check the alignment the second or third week in November.  The memorandum also discussed other areas Dresser was investigating to resolve the problem.  The parties agreed that Dresser would continue its attempts to resolve the vibration issue.

Subsequent to the closeout meeting, Friedel sent Pielow an email on November 17 stating that he was still waiting to receive the performance test report requested on October 15.  Friedel had

---

[13] *Id.* Ex. L.

[14] *Id.* Ex. M.

[15] *Id.*

5

previously given Dresser an October 28 deadline, but as that had passed Friedel now requested a response no later than November 18.[16]  Dresser responded that it was working on the report, but did not give Friedel any specific time estimate.  On December 1, Friedel again sent Pielow an email requesting the report.[17]

On December 9, 2003, Pielow sent Packard, STEC's plant manager, an email to begin the process of modifying the bearing pads, which Dresser believed would resolve the vibration problem.[18]  Pielow informed Packard that the spare pads would need to be sent off to have the modifications completed.  He said he would send Packard the shipping information the next week.  Packard followed up with Pielow on December 16, requesting the address to ship the pads; however, Dresser did not send Packard the shipping information until January 7, 2004.[19]  On February 20, 2004, Pielow sent Packard an email updating him that six of the pads had successfully been modified, but they were still missing two.  The email requested Packard send the remaining two, which he did on February 27.[20]  February 20 also  marked the date that Dresser finally sent STEC the performance report that Friedel had requested in October of the preceding year.[21]

The parties did not communicate again until July 7, 2004.  On this date, Dresser sent STEC

---

[16]  *Id.* Ex. Q.

[17]  *Id.*

[18]  D.'s M.S.J. (dkt. #20), Ex. 3, tab C.

[19]  *Id.* Ex. 4, tab A.

[20]  *Id.* tab B.

[21]  P.'s Resp. (dkt. #22), Ex. R.

its standard end of warranty letter indicating that STEC's warranty would expire on May 9, 2004.[22] The letter repeatedly stated that Dresser wanted to ensure that the machinery met all of STEC's expectations. The email accompanying the end of warranty letter stated that there were still a couple of issues that Dresser was addressing under the warranty. Pielow requested an update on the vibration and the status of the modified pads. He offered if the vibration levels were still high to "make arrangements to change the pads in the bearing" and requested a convenient time for Dresser's electrical engineer to inspect the emergency pump.[23] Packard responded on the same day by sending Pielow a letter reiterating that the vibration was still present, but "the levels [were] not consistently high."[24] After explaining the occasions when the ST unit experienced excessive vibrations, Packard requested Pielow's suggestions. Packard also stated that he had not received all the pads that were shipped off to be modified. The email concluded as follows: "I would like to take you up on the installation offer, but am probably unable to do so until after the summer months have passed. Can you extend this offer for that long?"[25] Packard further agreed to allow Dresser personnel to inspect the emergency pump at any time convenient for Dresser.

From early July 2004 until January 25, 2005 there again were no communications between the parties. On January 25, Packard emailed Pielow reiterating that the vibration was still an issue on the unit installed in Fall 2003. The email stated: "[STEC] has conducted several additional vibration studies with multiple consultants" and requested a rotor dynamic analysis to try to develop

---

[22]  D.'s M.S.J. (dkt. #20), Ex. 4, tab E.

[23]  *Id.* tab D.

[24]  P.'s Resp. (dkt. #22), Ex. S.

[25]  *Id.*

a solution to the problem.[26]  Pielow provided the rotor study the next day and stated that Dresser personnel would be coming by the STEC plant in the next week or two and wanted to inspect the emergency pump and set up a time to install the modified bearing pads.[27]  In response, Packard informed Pielow that STEC would most likely not elect to install the modified pads because the outside consultants did not believe that the modified pads would solve the vibration problem.[28]

STEC filed suit on March 10, 2006.  During the approximate three year period that STEC awaited a resolution to the vibration problem, it hired outside consultants to diagnose and repair the ST unit.  STEC hired Bently-Nevada in August 2003, Industrial Machinery Diagnostics and Turbine Component Engineering in 2004, and Bearings Plus in 2005, and now seeks to recover the expenses paid to these consultants in the amount of approximately $800,000 as direct costs to repair the ST.

## Summary Judgment Standard

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c); *Christopher Village, L.P. v. Retsinas*, 190 F.3d 310, 314 (5th Cir. 1999).  The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment, there must be an absence of any genuine issue of material fact.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-248 (1986).  An issue is "material" if its resolution could affect the outcome of the action.  *Daniels v. City of Arlington, Tex.*, 246 F.3d 500,

---

[26]  D.'s M.S.J. (dkt. #20), Ex. 5, tab A.

[27]  *Id.* tab B.

[28]  *Id.* tab C.

502 (5th Cir. 2001), *cert. denied*, 122 S.Ct. 347 (2001).

The moving party bears the initial burden of informing the court of all evidence demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Only when the moving party has discharged this initial burden does the burden shift to the non-moving party to demonstrate that there is a genuine issue of material fact. *Id.* at 322. If the moving party fails to meet this burden, then they are not entitled to a summary judgment and no defense to the motion is required. *Id*.

"For any matter on which the non-movant would bear the burden of proof at trial . . . , the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *Transamerica Ins. Co. v. Avenell*, 66 F.3d 715, 718-19 (5th Cir. 1995); *Celotex*, 477 U.S. at 323-25. To prevent summary judgment, the non-movant must "respond by setting forth specific facts" that indicate a genuine issue of material fact. *Rushing v. Kan. City S. Ry. Co.*, 185 F.3d 496, 505 (5th Cir. 1999).

When considering a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in favor of the non-movant. *In re Segerstrom*, 247 F.3d 218, 223 (5th Cir. 2001); *Samuel v. Holmes*, 138 F.3d 173, 176 (5th Cir. 1998). The court must review all of the evidence in the record, but make no credibility determinations or weigh any evidence, disregard all evidence favorable to the moving party that the jury is not required to believe, and give credence to the evidence favoring the nonmoving party as well as to the evidence supporting the moving party that is uncontradicted and unimpeached. *Willis v. Moore Indep. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000). However, the non-movant cannot

avoid summary judgment simply by presenting "conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation." *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994) (en banc).

## Discussion

Based on the court's diversity jurisdiction as well as the terms of the contract, Texas substantive law will apply. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *Spence v. Glock,* 227 F.3d 308, 311 (5th Cir. 2000). The general rules of contract construction guide this court's analysis. The primary concern in interpreting any contract is ascertaining the true intent of the parties. *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex.1996). Courts must give contract language its ordinary and generally accepted meaning. *Heritage*, 939 S.W.2d at 121. If contract language is worded so that it can be given a definite or certain legal meaning, it is not ambiguous, and courts construe it as a matter of law. *Id.* The court will examine the writing as a whole in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex.1983). There is a presumption that the parties to a contract intend every clause to have some effect. *Heritage*, 939 S.W.2d at 121. Finally, the court determines what conduct is required by the parties as a matter of law, but, insofar as a dispute exists concerning the failure of a party to perform the contract, the court submits the disputed fact questions to the jury. *Meek v. Bishop, Peterson & Sharp, P.C.*, 919 S.W.2d 805, 808 (Tex. App.–Houston [14th Dist.] 1996, writ denied).

## A.      Waiver

Dresser argues that STEC waived its right to repair or reimbursement because (1) it accepted

the equipment and made final payment; (2) it failed to demand repair or reimbursement during the warranty period; and (3) it failed to demand repair or reimbursement after the expiration of the warranty until it filed suit.  Waiver is an intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right.  *Sun Exploration & Prod. Co. v. Benton,* 728 S.W.2d 35, 37 (Tex. 1987).  In order to establish waiver as a matter of law, a party must conclusively prove (1) an existing right, benefit, or advantage; (2) knowledge, actual or constructive, of its existence; and (3) actual intent to relinquish the right, which can be inferred from conduct.  *First Interstate Bank v. Interfund Corp.*, 924 F.2d 588, 595 (5th Cir. 1991).  A court will not grant summary judgment on waiver unless the facts establishing waiver are admitted or clearly established.  *Tenneco Inc. v. Enter. Prod. Co.,* 925 S.W.2d 640, 643 (Tex. 1996).  Generally, waiver will be a fact question turning on the question of intent.  *Id.* at 643; *Shaver v. Schuster*, 815 S.W.2d 818, 824 (Tex. App.–Amarillo 1991, no writ) ("Whether defendant waived his right to enforce contractual right is question of defendant's intention as revealed by reasonable inferences to be drawn from the facts, a fact issue for jury's determination.").  "Intention is a prime factor in determining the question of waiver.  The acts, words or conduct relied upon to establish intention must be such as to manifest an unequivocal intention to no longer assert the right." *Tenneco*, 925 S.W.2d at 643.

Dresser maintains that STEC waived its right to repair or reimbursement for remedying the defective equipment because it accepted that equipment by making final payment.  The clear terms of the contract, however, belies Dresser's argument.  Paragraph 6.07 provides:

> WAIVER OF CLAIMS: The making and acceptance of final payment will constitute:
> A.      A waiver of all claims by Owner against Contractor, except claims arising from unsettled liens and claims, from defective Equipment and Materials appearing after final inspection, from defects in Field Services appearing after final payment, or from failure to comply

> with the Contract Documents or the terms of any special guarantees
> specified therein; however, final payment will not constitute a waiver
> by Owner of any rights in respect of Contractor's continuing
> obligations under the Contract Documents.

STEC alleges that Dresser breached the contract by providing defective equipment and field services. The plain language of this provision provides that no waiver occurs by making final payment with respect to defects in Field Services appearing after final payment, or from failure to comply with the Contract Documents. Thus, STEC's claims against Dresser fall squarely within the exceptions delineated by the waiver provision.

The second clause also specifies that final payment will not waive STEC's claims with respect to Dresser's continuing obligation. Dresser's continuing obligation under the contract is set forth in Paragraph 13.01:

> CONTRACTOR'S CONTINUING OBLIGATION; WARRANTIES, GUARANTEES:
> A.  Contractor has an obligation to furnish the Equipment and Materials and Field Services and to perform other services in connection therewith in accordance with the Contract Documents, and Contractor warrants and guarantees to Owner and Engineer that all Equipment and Materials, Field Services, and other services will be in accordance with the Contract Documents and free from defects in material and workmanship. Prompt notice of all observed defects will be given to Contractor. Contractor warrants the Equipment and Materials furnished under these Contract Documents shall be fit and suitable for the purpose as specified in the Contract Documents.
> B.  Neither recommendation of any progress or final payment by Engineer, nor any payment by Owner to Contractor under the Contract Documents, nor any use of the Equipment and Materials by Owner, nor any act of acceptance by Owner, nor any failure to do so, nor the issuance of a notice of acceptability by Engineer, nor any correction of defective Equipment and Materials or Field Services by Owner *will constitute an acceptance* of Equipment and Materials, Field Services, or other services not in accordance with the Contract Documents or a release of Contractor's obligation to furnish the Equipment and Materials, Field Services, and other services in accordance with the Contract Documents except as otherwise

12

provided in Paragraph 6.07.

Dresser's continuing obligation included an "obligation" to furnish equipment and field services in accordance with the Contract Documents.  Dresser also warranted that it would provide the equipment and field services free of defects.  Moreover, subparagraph B specifically provides that neither final payment nor acceptance will relieve Dresser of its obligations under the contract, further undermining Dresser's waiver argument.

At the time STEC made final payment on February 20, 2004, Dresser was operating within the warranty period and had a continuing obligation to provide equipment and field services free of defects.  Paragraph 6.07 clearly provides that STEC did not waive its claims by making final payment with respect to Dresser's continuing obligations under the contract.  Further, the notes from the closeout meeting and the ongoing communications between the parties documenting efforts to resolve the problem demonstrate that STEC made final payment with the understanding that the defects would be corrected.  The final payment did not waive STEC's claims because it explicitly qualified its making of final payment on Dresser's promise to continue work to resolve the vibration during the warranty period.  Dresser had a continuing obligation to provide equipment and field services free from defect, and final payment did not extinguish this obligation.  Thus, the court finds, as a matter of law, that STEC did not intentionally or implicitly waive any rights by making final payment.

Dresser also argues that STEC waived its breach of warranty and breach of contract claims because it failed to demand repair or reimbursement during the warranty period and failed to make

similar demands after the warranty period expired.[29]  The relevant contract provisions state:

>13.03    REMEDYING DEFECTIVE EQUIPMENT AND MATERIALS:
>>A.    If, at any time after Owner's acceptance of delivery under Paragraph 5.01A.5 and before expiration of the correction period, Owner or Engineer determines that the Equipment and Materials are defective, Contractor shall, upon written notice from and as required by Engineer, either correct the defects or remove the Equipment and Materials and replace it with nondefective Equipment and Materials. All field labor costs directly associated with such repair or replacement of the Equipment as stated above, which does not include the Purchaser's cost associated with maintenance or administration, shall be born by the Contractor.  If Contractor does do so promptly and to the satisfaction of Owner and Engineer, Owner may, upon Engineer's recommendations, accept the defective Equipment and Materials instead of requiring correction or removal and replacement.
>>B.    If Contractor fails to take action to either correct the defect or remove the Equipment  and Materials and replace it with nondefective Equipment and Materials, Owner may, after ten days written notice to Contractor, remedy any such deficiency instead of requiring removal or replacement.

>13.05    REMEDYING DEFECTIVE FIELD SERVICES:
>>C.    If, at any time Engineer notifies Contractor in writing that any of the Field Services are defective, Contractor shall promptly provide acceptable services.  If Contractor fails to do so, Owner may obtain Field Services elsewhere.

Before the end of the correction period, STEC was required to provide Dresser notice in writing that

defects existed.  Dresser, after notification, was required to correct the defects.  If Dresser failed to

promptly take action to correct the defective equipment, STEC, upon ten days written notice, could

---

[29] 13.04    CORRECTION PERIOD:
>A.    Contractor's responsibility for remedying all defects in the Equipment and Materials shall extend for a period twelve (12) months from the date of acceptance or twenty-one (21) months from the date of delivery to the Site, whichever shall first occur.

The parties dispute when the correction period ended.  Dresser maintains the period ended in May 2004, while STEC claims the warranty expired in September 2004. When the warranty expired is not crucial to this court's analysis.

14

replace or remedy the equipment itself. Similarly, if Dresser failed to promptly provide acceptable field services after notice, STEC could obtain services elsewhere.

The summary judgment evidence clearly establishes that STEC continually notified Dresser of the ongoing vibration problem, and based on Dresser's assurances to correct the problem, reasonably expected that the problem would be resolved. Almost immediately after the ST unit began operation in August 2003, Dresser was notified that excessive vibration existed and the unit was not performing as required by the contract. Dresser faults STEC for not demanding repair during the warranty period, but it is clear from the closeout meeting notes, as well as other correspondence, that a demand for repair had been made and Dresser recognized and accepted that it had a continuing obligation to correct the vibration problem. Thus, the fact that STEC did not continue to renew its demand to fix the problem during or after the warranty period is inconsequential because Dresser was fully aware of the problem and assured STEC it was working to resolve it.

Further, with respect to Dresser's post-warranty argument, Dresser's end of warranty letter and the accompanying email evidences that it explicitly recognized that the vibration problem still existed and outlined specific actions it intended to take to remedy the problem. Thus, even after the warranty period expired, by both parties' accounts, Dresser continued to make representations that it intended on correcting the vibration problem, effectively acknowledging that a demand for repair had been made. The demands for repair were made and carried over into the warranty period and thereafter. Thus, Dresser has not conclusively established that STEC waived any of its claims by failing to demand repair during or after the warranty period.

However, STEC did not demand reimbursement or notify Dresser of its intentions to hire

outside consultants.  The contract language provided: "If Contractor fails to take action to either correct the defect or remove the Equipment and Materials and replace it with nondefective Equipment and Materials, Owner may, after ten days written notice to Contractor, remedy any such deficiency instead of requiring removal or replacement."  The plain language of the contract did not specify what the written notice required before STEC could proceed to remedy the defects itself. Did STEC have to notify Dresser simply that there was a defect, did it have to provide detailed information about the defect, about seeking outside services, how much the services would cost, etc.?  While it appears that STEC never requested reimbursement for remedying the defective equipment or never notified Dresser of its intent to hire consultants to analyze the problem, STEC did provide notice to Dresser that a defect existed and indicated in several communications that it was using outside consultants to help diagnose and repair the vibration problem. In Dresser's defense, though, the correspondence between the parties evidenced that up until January 25, 2005 Dresser still reasonably believed that it was going to change the bearing pads to fix the problem. Thus, viewing the evidence in a light most favorable to STEC, the court finds that a genuine fact issue exists as to whether STEC's communications or conduct  waived its claims to reimbursement for repairing the defective equipment.

Dresser makes a related argument that STEC waived its claims because it failed to give the proper ten days written notice as required by the contract under Paragaph 13.03(B).  The contract terms provided that STEC should give Dresser ten days written notice of defect in person or by registered mail.[30]  Under these circumstances, the purpose of the notice provision was to provide

---

[30]  16.01   GIVING NOTICE:
        A.   Whenever any provision of the Contract Documents requires the giving of written notice, it shall be deemed to have been validly given if delivered in

adequate warning of the defects and an opportunity to redress the problem before STEC could seek outside assistance.  Texas courts have held that strict compliance with written notice provisions is not required if the receiving party was given actual notice.  *See Adcock v. First City Bank of Alice,* 802 S.W.2d 305, 307 n.3 (Tex. App.–San Antonio 1990, no writ) (finding written notice requirement satisfied by actual knowledge).  On numerous occasions, Dresser received notice of the defective equipment. Moreover, Dresser has not shown how the form of the notice made any difference. Mailing the notice would have been redundant and futile, and the law does not require such a useless gesture.  The emails sent by STEC were received by the appropriate Dresser personnel and accomplished the purpose of notifying Dresser that a problem existed.  Further, each notice gave Dresser ample opportunity beyond ten days to correct the problem.  Although the notice may not have complied with the strict requirements of the contract, the court finds that a genuine issue of material fact exists as to whether STEC's notice of the defective equipment was effective and in substantial compliance with the terms of the contract. *See Tex. Util. Elec. Co. v. Aetna Cas. & Surety Co.*, 786 S.W.2d 792, 793-94 (Tex. App–Dallas 1990, writ denied) (notice sent to and received at office location other than office location specified by contract substantially complied with contract terms); *see also Ray v. Metro. Life Ins. Co.*, 858 F. Supp. 626, 629 (S.D. Tex. 1994) (finding notice to substantially comply with the contractual notice requirement and it performed the function for which the contract notice requirement was intended).

---

person to the individual or to a member of the firm or to an officer of the corporation for whom it is intended, or if delivered at or sent by registered or certified mail, postage prepaid, to the last business address known to the giver of the notice.

**B.    Dispute Resolution**

Next, Dresser argues it is also entitled to summary judgment because STEC failed to complete the mandatory dispute resolution procedures set out in the contract which were a condition precedent to bringing this suit.  STEC maintains that the condition precedent relating to dispute resolution only applied to disputes arising during construction.  Alternatively, STEC contends pursuing the dispute resolution procedure at this point would be futile, and if the court should find that the dispute resolution procedure was a condition precedent to bringing suit, STEC argues the court should abate, as opposed to dismiss, this proceeding for the parties to complete dispute resolution pursuant to the contract.

A condition precedent is an event that must happen or be performed before a right can accrue to enforce an obligation.  *Centex Corp. v. Dalton,* 840 S.W.2d 952, 956 (Tex. 1992).  A condition precedent to the right to maintain an action must be performed, and "the fact of performance or excuse of nonperformance must be alleged and proved in order to warrant a recovery."  *S.W. Associated Tel. Co. v. City of Dalhart*, 254 S.W.2d 819, 825 (Tex. Civ. App.–Amarillo 1952, writ ref'd n.r.e.).  The burden of proof remains on the plaintiff to prove that all conditions precedents have been satisfied.  *Trevino v. Allstate Ins. Co.*, 651 S.W.2d 8, 12 (Tex. App.–Dallas 1983, writ ref'd n.r.e.).  Texas courts excuse non-performance of a condition precedent if the condition's requirement "(a) will involve extreme forfeiture or penalty, and (b) its existence or occurrence forms no essential part of the exchange for the promisor's performance."  *Varel v. Banc One Capital Partners, Inc.*, 55 F.3d 1016, 1018 (5th Cir. 1995) (citations omitted).  Texas courts examine whether performing the condition precedent was the object of the contract or merely incidental to it, and whether not performing it caused any loss. *Id.*

The contract has two provisions pertaining to dispute resolution:

9.04   <u>DECISIONS ON DISPUTES</u>:
    A.    . . .
    B.    The rendering of a decision by Engineer pursuant to Paragraph 9.04A with respect to any such claim, dispute, or other matter except any which have been waived by the making or acceptance of final payment as provided in Paragraph 6.07 will be a condition precedent to any exercise by Owner or Contractor of such rights or remedies as either may otherwise have under the Contract Documents or at Law in respect of any such claim, dispute, or other matter.

15.01   <u>GENERAL</u>: (under the Dispute Resolution heading)
    A.    All claims, disputes, and other matters in question (the "Dispute") between Owner and Contractor arising out of, or relating to the Contract Documents or the breach thereof except for claims which have been waived by the making or acceptance of final payment as provided by Paragraph 6.07 shall be finally settled pursuant to the expedited dispute resolution process as set out in this paragraph.  If either party believes a Dispute exists, it shall promptly give written notice of such Dispute to the  other party, with reasonable detail concerning the nature and subject matter of the Dispute.  For 30 days following such notice, the parties shall discuss whether they can mutually agree to a resolution of the Dispute.  If the parties cannot resolve the Dispute within such 30 day period, either party may request in writing that the Dispute be referred to upper level management of Owner and Contractor for further discussion for an additional 30 days.
    B.    No request for Dispute referral to upper level management of any Dispute that is required to be referred to Engineer initially for decision in accordance with Paragraph 9.04 shall be made until the earlier of: (a) the date on which Engineer has rendered a decision, or (b) the tenth day after the parties have presented their evidence to Engineer if a written decision has not been rendered by Engineer before that date.  No request for Dispute referral to upper level management shall be made later than 30 days after the date on which Engineer has rendered a written decision in respect thereof, and the failure to request for Dispute referral to upper level management within said 30 days period shall result in Engineer's decision being final and binding upon Owner and Contractor.

After reviewing the plain language of these contract provisions, there is no indication that the condition precedent in Paragraph 9.04 only applied during the construction of the project, as

STEC claims.  However, while the contract set forth dispute resolution procedures as a condition precedent to bringing suit, if the court were not to excuse STEC's failure to satisfy the condition precedent, it would work an incongruous forfeiture on STEC's rights. Further, recognizing that dispute resolution is always a worthwhile endeavor, it was not central to the object of this contract. *See* RESTATEMENT (SECOND) OF CONTRACTS § 229 & cmt. b, illus. 2 (1981) ("A court can excuse the non-occurrence of a condition to the extent its non-occurrence would cause a disproportionate forfeiture so long as the occurrence was not a material part of the agreement.").  Dresser did not respond to STEC's argument that participating in the contractual dispute resolution procedure at this point would be futile, but only advocates for summary judgment.  However, this court will not forfeit STEC's rights based on an unsatisfied condition precedent that is only incidental to the object of the contract.  The court also does not believe that abatement is prudent in the case. Abating the case to allow the parties to participate in the contractual dispute resolution procedure would serve no further purpose other than to unnecessarily delay the adjudication of STEC's claims.  Therefore, STEC's failure to comply with the dispute resolution procedures is legally excused.

## C.      Consequential Damages

Finally, Dresser seeks partial summary judgment on STEC's claims for consequential damages stemming from Dresser's alleged breach of contract.  STEC has not specifically responded to this argument, but the plain language of the contract establishes that Dresser will not be liable for consequential damages.  The relevant provisions provide:

> 13.06    COSTS OF REMEDYING DEFECTS:
> A.      All direct, ~~indirect and consequential~~ costs of correcting, removing, and replacing defective Equipment and Materials or of obtaining Field Services elsewhere and of exercising Owner's rights and remedies under paragraphs 5.01A.5 and 13.03 through 13.05 inclusive, will be charged against Contractor in an amount verified

by Engineer; and, if incurred prior to final payment, a Change Order will be issued incorporating the necessary revisions in the Contract Documents and a reduction in the Contract price, or if incurred after final payment, an appropriate amount will be paid by Contractor to Owner. Such direct, indirect and consequential costs will include, in particular but without limitation, compensation for additional professional services required and all costs of repair and replacement of Equipment and Materials, or property of Owner or others destroyed or damaged by correction, removal, or replacement of defective Equipment and Materials up to the Contract Price.

16.03   <u>CUMULATIVE REMEDIES</u>
    A.     . . .
    B.     In no event shall Contractor be liable in contract, tort, strict liability, warranty or otherwise, for any special, indirect, incidental or consequential damages, such as, but not limited to, loss of anticipated profits or revenue, loss of use, non-operation or increased expense of operation of this or other equipment, cost of capital, cost of purchased or replacement power and/or facilities, damages to environment, or claims of customers of Purchaser for damages, and the Owner shall release and hold harmless Contractor from any such damages.

STEC was actively involved in drafting and negotiating this contract.  The excluded language and the liability limitations clauses clearly demonstrate that the parties contemplated consequential damages, but rejected them in the final written contract.  Therefore, Dresser is entitled to summary judgment on the issue of consequential damages.

Defendant also seeks partial summary judgment on STEC's negligence and breach of implied warranty claims.  The court will not address these contentions because STEC concedes that summary judgment is appropriate with respect to these claims.[31]

## Conclusion

Accordingly, the court GRANTS summary judgment in favor of Dresser with respect to the

---

[31] *See* P.'s Resp. (dkt. #22), p. 19.

negligence and breach of implied warranty claims pending against it.  The court also finds that the

liability limitations provision is effective precluding STEC's claims for consequential damages.

However, the court DENIES Dresser's motion for summary judgment to the extent it argues that

STEC waived its claims for breach of contract and breach of warranty, or failed to satisfy a

condition precedent to bringing suit.  Dresser also has a motion for leave to file a reply and motion

to enlarge time pending (dkt. #23).  The court considered Dresser's reply in its analysis, therefore

it will GRANT Dresser's motion for leave.

It is so ORDERED.

SIGNED this 7th day of September, 2007.


_____
JOHN D. RAINEY
UNITED STATES DISTRICT JUDGE

22